PIERCE, Chief Judge.
Appellant Arthur Thomas, Jr. appeals from three judgments of conviction entered against him by the Pinellas County Circuit Court after being convicted by jury of narcotic law violations.
On November 18, 1969, appellant Thomas was charged in three separate informations filed in the Pinellas County Circuit Court, each charging a violation of the State Narcotics Law. On December 12, 1969, he was arraigned upon each of said in-formations, entered pleas of not guilty, and the cases were set for trial upon separate dates between February 23rd and March 9th, 1970. On January 21, 1970, upon praecipe of Thomas, a witness subpoena for Steven Geng, whose address was listed as “c/o Pinellas County Sheriff Pinellas County Jail Clearwater, Florida” was issued by the Court Clerk returnable before the Circuit Court on Monday, February 23, 1970 at 9:30 o’clock A.M. This witness subpoena was served personally upon Geng, presumably at the local County Jail, on January 23, 1970.
*201 On February 20, 1970, Thomas filed motion to dismiss the informations which set forth that subsequent to service of the witness subpoena and “by authority and encouragement of the State of Florida, Steven Geng left Pinellas County and the State of Florida”, that his current whereabouts were unknown to Thomas, and that his absence “was effected by the State of Florida, after the witness became subject to the jurisdiction of this Court”. On the said February 20th, Thomas filed motion for continuance which followed generally the allegations of the motion to dismiss. On the same day the aforesaid motions were filed, February 20th, the Court held hearing, wherein the Court observed that the motion for continuance “might * * * be * * * premature” and thereupon continued the matter until the following Monday morning, February 23, 1970 (the date previously set for trial) to see if the witness Geng would “show up Monday”. Thomas’s counsel then indicated he would file an amended motion for continuance on Monday morning, which he did and on Monday the hearing proceeded.
The amended verified motion averred that if present Geng would testify that during the first week in October, 1969, Geng had introduced Detective Harrell, of the local Police Department to Thomas, “for the purpose of entra/>ing * * * [Thomas] into selling or possessing illegal narcotics; that he provided information to the prosecution, as an informer or ‘special employee’, which led to * * * Thomas * * * being a possible suspect for violation of narcotic law”; that “the State of Florida procurred the absence of the witness [Geng] from within this State after service of the witness subpoena” upon him; and that Geng was “not absent through the procurement, connivance, or consent, either directly or indirectly,” of Thomas. After filing the amended motion for continuance, the hearing proceeded on February 23rd, during which Mr. Lenderman, counsel for Thomas, represented to the Court that shortly after Geng was served with the witness subpoena—
“I [Mr. Lenderman] found out, through Judge Overton, a man named Sayles, who is with the Probation and Parole Commission, supervising probation official, that Steven Geng was allowed, or sent out of the state, probably for his own protection, and he was— they first tried to get him out to Providence, Rhode Island, and the authorities up there would not accept him. However, he was accepted by the city authorities in New York City.
As of Friday afternoon, [February 20th], Mr. Sayles, the probation officer, told me he had not heard a thing from the probation officer in New York City about Steven Geng’s arrival. All he knew is that the kid was sent away, and he isn’t here now, and he doesn’t know for sure that he even reached New York City, * * * that * * * he introduced Detective Thomas Harrell of the St. Petersburg Police Department to the defendant, Arthur Thomas, Jr., for the purpose of setting him up for arrest * * * The allegations on the Motion stated that the absence of the witness was procured by the State of Florida. I think I am correct in that assumption.
Mr. Jagger [Public Defender] is fully aware of this, as is Judge Overton, and as is Mr. Sayles, the probation officer in this case.
I don’t know the exact circumstances as to the release of Steven Geng from the county jail. He was held a couple of months. No charges, on open file. Bob Jagger, as attorney, filed a habeas corpus, and about that time certain deals were made for his release from jail, the charges were dropped against him, and then he disappeared”.
Extended discussion between counsel and the Court ensued, during which the State Attorney himself, with commendable candor, gave the Court certain background *202 facts involving Geng which throw considerable light upon the somewhat nebulous developments transpiring immediately preceding Geng’s departure from the State. The State Attorney told the Court:
“Geng was in jail on violation of probation charge by the presiding Judge of this Court. He had several charges pending against him in Justice of Peace Court which were not prosecuted by the State Attorney’s Office, but the whole time he was sitting in Genung’s hotel, he was there on the violation of probation charge, and not on any charge brought by the State of Florida.
What happened, Mr. Geng was a previous narc, and had done informative work for the police department. He came and told them about the operation of this heroin ring, and at that time they employed him as an undercover agent. While he was — as a confidential . informer, while he was working for them he got involved with the needle a little bit himself, and subsequently the St. Petersburg Police Department charged him. While he was actually a .confidential informant, they charged him with use of heroin because he was shooting himself, and I believe he helped with the shooting of a seventeen year old.
Those cases were not prosecuted for many reasons.. One was he was actually involved by the police in this operation.
He had agreed he was going back to the hospital in Raiford for treatment for his addiction, and I believe subsequently Judge Overton permitted his probation to be transferred to New York, but I know nothing about this.
It is just inconceivable to me, though —and we have a letter that was intercepted from this Steven Geng, this man they are going to use as a witness, that he wrote a Clarence Martin, who has subsequently pleaded guilty before this Court to these charges, or similar charges, and this letter to Martin talked about the fact Geng had been going to each one of these individuals and trying to get them to use the defense of entrapment.”
The Court then denied the motion for continuance and proceeded with the trials. Thomas was convicted and he has appealed to this Court. The principal bone of contention here is the motion for continuance.
Thomas had originally been charged in four different informations, Nos. 19,506-7-8-10 in the Circuit Court, all charging narcotic violations. The State had announced from the beginning that it was not insisting at that time upon trial of Case No. 19,510, which was the case wherein Geng had originally been allegedly brought into direct contact with Thomas in the sequence of events out of which the prosecutions arose. The State contended at the hearing on February 23rd that, inasmuch as Thomas and Geng did not come into personal contact with each other except as to the charge contained in No. 19,510, (which involved the first transaction wherein Thomas was allegedly involved, on October 16, 1969), Thomas could only be heard to raise the defense of entrapment in that one case and that such defense was not open to him in the other three cases.
But this argument of the State, reiterated in this Court, is fallacious because it misses the two main points involved, namely, (1) it is not a question of when, where, or how many times there was contact between Geng and Thomas but rather whether the dealing in narcotics was instigated or induced by an officer of the law or his agent for purpose of prosecution without previous intention to violate the law on the part of the one so induced, and (2) whether, upon the showing made to the Court on the morning of February 23, 1970, the cases should have been continued or at least postponed for a reasonably short period, to enable Thomas and his counsel to have the benefit of Geng’s testimony or deposition in furtherance of their attempted defense of entrapment.
*203 (1) It is established law in this State that “one who is instigated, induced, or lured by an officer of the law or other person, for the purpose of prosecution, into the commission of a crime which he had otherwise no intention of committing may avail himself of the defense of ‘entrapment’.” Lashley v. State, Fla.1953, 67 So. 2d 648; 22 C.J.S. Criminal Law § 45(1), p. 137; Ybor v. United States, C.C.A., 5, 31 F.2d 42. So it is relatively unimportant what Geng’s motives were, or whether his participation was direct or indirect, or minor or major. The critical issue on entrapment would be the purpose and motive of the St. Petersburg Police Department or its representatives. As stated by Justice Terrell in Peters v. Brown, Fla.1951, 55 So. 2d 334: “It is contrary to law and public policy for an officer * * * to induce the commission of a wrong or a crime for the purpose of securing a pretext to punish it.”
(2) This brings us to the real crux of the case, whether the trial Court properly or improperly denied the motion for continuance on the morning of the trial, February 23, 1970. While the question is a sensitive one for us to decide, it is our considered view that, upon the status of the case as it stood before the trial Judge at that time, a continuance, or at least a reasonable postponement of the trial, should have been ordered.
On and before January 23, 1970, Geng was in the actual or constructive custody of the Pinellas County Sheriff. On that day he was duly served with a witness subpoena, issued upon praecipe of Thomas’s counsel, returnable before the Circuit Court on February 23rd to testify on behalf of Thomas. Sometime between the date of service and February 20th Geng was “sent out of the State” to New York City by law enforcement officials of Florida—and this without the consent or even knowledge of Thomas’s counsel of record. To state the case is almost to answer the question it poses. In such posture the least consideration that should have been accorded Thomas would have been to grant him at least a limited postponement of the trial.
It may well be that if and when Geng’s story was adduced either in person or by deposition, Thomas would not have been benefitted thereby. The defense of entrapment may have wholly failed to materialize but Thomas and his counsel were, by all the rudiments of elementary justice, entitled to the opportunity of presenting, or attempting to present, the defense of entrapment. As said by the 3rd District Court in Thomas v. State, Fla.App. 1966, 185 So.2d 745: “The rule springs from decency, good faith, fairness and justice” and it is therefore “necessary to consider the conduct of the state agents” as well as the disposition of the defendant in determining whether the defense is available.
It is true that a motion for continuance, especially in a criminal case, is in the discretion of the trial Court, yet “where * * * the order amounts in essence to the deprivation of * * * a part of due process by the organic law of our state and nation, the ruling may constitute a proper ground for relief”,, even collaterally under CrPR 1.850, 33 F.S.A. Such was the holding of the 1st District Court in French v. State, Fla.App.1964, 161 So.2d 879, which in principle we approve.
One final word before we wind up this rather prolix opinion. It is to be understood that nothing said herein shall be considered in the slightest derogatory of the lower Court or its officials. We are sure that what was done at all levels and in all spheres was in the utmost good faith and with due regard to the best interests of Geng. It was asserted in argument at the bar of this Court that intense feelings had been engendered as the outgrowth of developments in the Thomas and kindred cases then simultaneously under investigation, even to the extent of people being murdered. So we must assume, as we do, that the trial Court acted with due caution in the light of the facts and circumstances then existing or appearing to the Court. *204 And it also may be that our instant determination could result in the ultimate release of a despicable narcotic peddler. But the stability of our criminal jurisprudence and a zealous regard for preservation of the organic rights of the individual, whomever he may be, must always take precedence over the incidental outcome of a particular case.
The judgments in the three consolidated cases sub judice are reversed.
HOBSON and MANN, JJ., concur.